**burns charest** llp

Daniel H. Charest
dcharest@burnscharest.com

June 30, 2022

**Via CM/ECF**
United States Court of Appeals for the Fifth Circuit
Office of the Clerk
F. Edward Hebert Building
600 S. Maestri Place
New Orleans, LA 70130-3408

Re:    *Richard Devillier, et al. v. State of Texas*, Case No. 21-40750–Notice of Supplemental Authority

Dear Clerk of Court,

Appellees submit this notice of supplemental authority.

In *Torres v. Texas Dep't of Public Safety*, No. 20-603, 2022 WL 2334306 (June 29, 2022), the Court ruled that, by virtue of joining the Union, the State of Texas waived any defense of sovereign immunity for Torres' claim under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4301 *et seq.* The Court's holding bears on the sovereign immunity issues in this case and supports Plaintiffs' right to maintain their suit against the State of Texas.

In *Torres*, the Court cited *PennEast Pipeline Co., LLC v. New Jersey*, 142 S. Ct. 2244 (2021), for the test to be applied when deciding whether a structural waiver of a State's sovereign immunity existed: "whether the federal power at issue is 'complete in itself, and the State's consented to the exercise of that power—in its entirety—in the plan of the Convention.'" Slip Op. at 6, 2022 WL 2334306 at *5. "States may be sued if they agreed their sovereignty would yield as part of the 'plan of the Convention'—that is, if the structure of the original Constitution itself reflects a waiver of States' sovereign immunity." Slip Op. at 4, 2022 WL 2334306 at *1 (cleaned up). "Where that is so, the States implicitly agreed that their sovereignty would yield to that of the Federal Government 'so far as is necessary to the enjoyment of the powers conferred upon it by the Constitution.'" Slip Op. at 6, 2022 WL 2334306 at *5 (cleaned up).

The Court reversed the Texas state court decisions which had upheld the State's sovereign immunity defense, allowing plaintiff Torres to proceed with his claim for monetary damages against the State of Texas. In so holding, the Court confirmed that monetary relief can be sought against a State under a federal statute based on the State's waiver of sovereign immunity in the plan of the Convention. Therefore, a suit for monetary relief against a State based on a claim arising directly from the text of the United States Constitution reflects the same (if not more obvious) waiver.

United States Court of Appeals for the Fifth Circuit
Office of the Clerk
June 30, 2022
Page 2

Best regards,

**BURNS CHAREST LLP**

Daniel H. Charest, Partner

Cc:     All counsel of record via the Court's CM/ECF filing system.
Encl.   Ex. A – Slip Opinon

# EXHIBIT A

(Slip Opinion)          OCTOBER TERM, 2021                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TORRES *v.* TEXAS DEPARTMENT OF PUBLIC SAFETY

CERTIORARI TO THE COURT OF APPEALS OF TEXAS,
THIRTEENTH DISTRICT

No. 20–603.   Argued March 29, 2022—Decided June 29, 2022

Article I of the Constitution grants Congress the power "[t]o raise and support Armies" and "[t]o provide and maintain a Navy." §8, cls. 1, 12–13. Pursuant to that authority, Congress enacted the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), which gives returning servicemembers the right to reclaim their prior jobs with state employers and authorizes suit if those employers refuse to accommodate veterans' service-related disabilities. See 38 U. S. C. §4301 *et seq.* Petitioner Le Roy Torres enlisted in the Army Reserves in 1989. In 2007, he was called to active duty and deployed to Iraq. While serving, Torres was exposed to toxic burn pits, a method of garbage disposal that sets open fire to all manner of trash, human waste, and military equipment. Torres received an honorable discharge. But he returned home with constrictive bronchitis, a respiratory condition that narrowed his airways and made breathing difficult. These ailments, Torres says, left him unable to work his old job as a state trooper. Torres asked his former employer, respondent Texas Department of Public Safety (Texas), to accommodate his condition by reemploying him in a different role. Texas refused. So Torres sued Texas in state court to enforce his rights under USERRA. §4313(a)(3). Texas tried to dismiss the suit by invoking sovereign immunity. The trial court denied the State's motion. An intermediate appellate court reversed, reasoning that, under this Court's case law, Congress could not authorize private suits against nonconsenting States pursuant to its Article I powers except under the Bankruptcy Clause, citing *Central Va. Community College* v. *Katz*, 546 U. S. 356. The Supreme Court of Texas denied discretionary review. After the decision below, this Court issued *PennEast Pipeline Co.* v. *New Jersey*, 594 U. S. ___. *PennEast* held that the States waived their sovereign

Syllabus

immunity as to the federal eminent domain power pursuant to the "plan of the Convention." The Court then granted Torres' petition for certiorari to determine whether, in light of that intervening ruling, USERRA's damages remedy against state employers is constitutional.

*Held*: By ratifying the Constitution, the States agreed their sovereignty would yield to the national power to raise and support the Armed Forces. Congress may exercise this power to authorize private damages suits against nonconsenting States, as in USERRA. Pp. 3–16.

(a) While courts generally may not hear private suits against nonconsenting States, see *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779, the States remain subject to suit in certain circumstances. States may consent to suit, see *Sossamon* v. *Texas,* 563 U. S. 277, 284; Congress may abrogate States' immunity under the Fourteenth Amendment, see *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 456; and, as relevant here, States may be sued if they agreed their sovereignty would yield to the exercise of a particular federal power as part of the "plan of the Convention," *PennEast,* 594 U. S., at ___—that is, if "the structure of the original Constitution itself" reflects a waiver of States' immunity, *Alden* v. *Maine,* 527 U. S. 706, 728.

Consistent with these principles, the Court long ago found structural waiver as to suits between States, see *South Dakota* v. *North Carolina,* 192 U. S. 286, and suits by the United States against a State, see *United States* v. *Texas,* 143 U. S. 621. A century later, in *Central Va. Community College* v. *Katz,* 546 U. S. 356, the Court recognized another structural waiver, holding that Congress may authorize private suits against States under the Bankruptcy Clause. For several years, both before and after *Katz,* the Court declined to acknowledge additional waivers of sovereign immunity under Congress' Article I powers or to find Article I authority to abrogate immunity. See, *e.g., Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44; *Florida Prepaid Postsecondary Ed. Expense Bd.* v. *College Savings Bank,* 527 U. S. 627. Last Term, in *PennEast,* the Court considered whether Congress could, pursuant to its eminent domain power, authorize private suits against States to enforce federally approved condemnations necessary to build interstate pipelines. *PennEast* held that Congress could authorize such suits because, upon entering the federal system, the States implicitly agreed their "eminent domain power would yield to that of the Federal Government." 594 U. S., at ___. *PennEast* defined the test for structural waiver as whether the federal power is "complete in itself, and the States consented to the exercise of that power—in its entirety—in the plan of the Convention." *Id.,* at ___. Pp. 4–6.

(b) Congress' power to build and maintain the Armed Forces fits *PennEast*'s test, as the Constitution's text, its history, and this Court's precedents show. To begin, the Constitution's text strongly suggests a

Syllabus

complete delegation of authority to the Federal Government to provide for the common defense.  Article I spells out Congress' many related powers across multiple provisions, §8, cls. 1, 11–16; Article II makes the President the "Commander in Chief,"  §2, cl. 1; and Article IV charges the Federal Government with "protect[ing]" States "against Invasion," §4.  The Constitution also divests the States of like authority, see Art. I, §10, cls. 1, 3, assigning them only a limited role in "the Appointment of the Officers" to and the "training [of] the Militia," "according to the discipline prescribed by Congress," §8, cl. 16.  History teaches the same lesson.  "[T]he want of power in Congress to raise an army" under the Articles of Confederation had left the National Government "dependen[t] upon the States" to supply military forces via a system of quotas and requisition that had nearly cost the fledging Nation victory in the Revolutionary War.  *Selective Draft Law Cases*, <u>245 U. S. 366, 381</u>.  The Constitution, by design, worked "an entire change in the first principles of the system," giving Congress direct power over the "*formation*, *direction* or *support* of the NATIONAL FORCES."  The Federalist No. 23, p. 148 (A. Hamilton).  By ratifying that document, the States well knew that their sovereignty would give way to national policy to build and maintain the Armed Forces.  Consistent with this structural understanding, Congress has long legislated regarding military forces at the expense of state sovereignty.  See, *e.g.,* <u>1 Stat. 182</u>.  This Court's precedents likewise show that ordinary background principles of state sovereignty are displaced in this uniquely federal area.  See, *e.g., Tarble's Case,* 13 Wall. 397, 398 (the "National government['s] . . . power 'to raise and support armies' " cannot be "question[ed by] any State authority"); *United States* v. *Oregon,* <u>366 U. S. 643, 648</u>–649 (authority "normally left to the States" is displaced by Congress' "constitutional powers to raise armies and navies").

Under *PennEast's* test, Congress' power to build and maintain a national military is "complete in itself": Upon entering the Union, the States agreed that their sovereignty would "yield . . . so far as is necessary" to federal policy for the Armed Forces.  594 U. S., at ___.  Because the States committed not to "thwart" this federal power, "[t]he consent of a State," including to suit, "can never be a condition precedent" to Congress' chosen exercise.  *Id.,* at ___.  Pp. 6–12.

(c) No contention to the contrary persuades the Court otherwise.  The categorical claim that Congress may not exercise its Article I powers to abrogate state sovereign immunity ignores the fact that "congressional abrogation is not the only means of subjecting States to suit. . . . States can also be sued if they have consented to suit in the plan of the Convention." *PennEast*, 594 U. S., at ___.  Nor is USERRA's text insufficiently clear to displace potential immunity under Texas law.  USERRA expressly "supersedes any State law . . . that reduces,

4        TORRES *v.* TEXAS DEPARTMENT OF PUBLIC SAFETY

Syllabus

limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit." §4302(b). Neither *Seminole Tribe* nor *Alden* compels a different result. Congress' commerce powers, at issue in *Seminole Tribe*, are distinguishable from its war powers under *PennEast*'s "complete in itself" inquiry. And in *Alden*, the Court expressly embraced "'the postulate that States . . . shall be immune from suits, without their consent, *save where there has been "a surrender of this immunity in the plan of the convention.*"'" 527 U. S., at 730 (emphasis added). That "save where" proviso recognizes exceptions for structural waivers, supplying the basis for the Court's decisions in *PennEast* and *Katz*, as well as the decision today. Finally, the idea that *PennEast* and *Katz* involved *in rem* actions and the fact that USERRA suits lack a certain founding-era pedigree do not make a difference under *PennEast*'s basic reasoning.

The Court therefore holds that, in joining together to form a Union, the States agreed to sacrifice their sovereign immunity for the good of the common defense. Pp. 12–16.

583 S. W. 3d 221, reversed and remanded.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, and KAVANAUGH, JJ., joined. KAGAN, J., filed a concurring opinion. THOMAS, J., filed a dissenting opinion, in which ALITO, GORSUCH, and BARRETT, JJ., joined.

Cite as: 597 U. S. ____ (2022)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–603

## LE ROY TORRES, PETITIONER *v.* TEXAS DEPARTMENT OF PUBLIC SAFETY

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF TEXAS, THIRTEENTH DISTRICT

[June 29, 2022]

JUSTICE BREYER delivered the opinion of the Court.

The Constitution vests in Congress the power "[t]o raise and support Armies" and "[t]o provide and maintain a Navy." Art. I, §8, cls. 1, 12–13. Pursuant to that authority, Congress enacted a federal law that gives returning veterans the right to reclaim their prior jobs with state employers and authorizes suit if those employers refuse to accommodate them. See Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U. S. C. §4301 *et seq.* This case asks whether States may invoke sovereign immunity as a legal defense to block such suits.

In our view, they cannot. Upon entering the Union, the States implicitly agreed that their sovereignty would yield to federal policy to build and keep a national military. States thus gave up their immunity from congressionally authorized suits pursuant to the "'plan of the Convention,'" as part of "'the structure of the original Constitution itself.'" *PennEast Pipeline Co.* v. *New Jersey*, 594 U. S. ___, ___ (2021) (slip op., at 14) (quoting *Alden* v. *Maine*, 527 U. S. 706, 728 (1999)).

Opinion of the Court

# I

## A

Congress has "broad and sweeping" power "to raise and support armies." *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968). It has long exercised that power to encourage service in the Armed Forces in a variety of ways. See, *e.g.*, *Rumsfeld* v. *Forum for Academic and Institutional Rights, Inc.*, 547 U. S. 47, 58 (2006) (campus recruiting); *Johnson* v. *Robison*, 415 U. S. 361, 376 (1974) (educational benefits). Since before the United States' entry into World War II, Congress has sought, in particular, to smooth volunteers' reentry into civilian life by recognizing veterans' "right to return to civilian employment without adverse effect on . . . career progress" in the federal work force and private employment. H. R. Rep. No. 105–448, p. 2 (1998); see Selective Training and Service Act of 1940, §§8(b)(A)–(B), (e), 54 Stat. 890, 891 (damages remedy against private employers).

The Vietnam War prompted Congress to extend these protections to employment by States. Amidst political opposition to the war, "some State and local jurisdictions ha[d] demonstrated a reluctance, and even an unwillingness, to reemploy" returning servicemembers. S. Rep. No. 93–907, p. 110 (1974). So Congress authorized private damages suits against States to ensure that "veterans who [had] previously held jobs as school teachers, policemen, firemen, and other State, county, and city employees" would not be denied their old jobs as reprisal for their service. *Ibid.* The statute at issue, USERRA, embodies these protections today.

## B

Petitioner Le Roy Torres enlisted in the Army Reserves in 1989. In 2007, he was called to active duty and deployed to Iraq. While serving, Torres was exposed to toxic burn pits, a method of garbage disposal that sets open fire to all manner of trash, human waste, and military equipment.

Opinion of the Court

Torres received an honorable discharge. But he returned home with constrictive bronchitis, a respiratory condition that narrowed his airways and made breathing difficult. These ailments, Torres alleges, changed his life and left him unable to work at his old job as a state trooper. Torres asked his former employer, respondent Texas Department of Public Safety (Texas), to accommodate his condition by reemploying him in a different role. Texas refused to do so.

Torres sued Texas in state court. He argued that Texas had violated USERRA's mandate that state employers rehire returning servicemembers, use "reasonable efforts" to accommodate any service-related disability, or find an "equivalent" position (or its "nearest approximation") where such disability prevents the veteran from holding his prior position. 38 U. S. C. §4313(a)(3). Texas moved to dismiss the suit by invoking sovereign immunity. The trial court denied the motion. A divided intermediate appellate court reversed, stating this Court's precedents established that Congress could not authorize private suits against nonconsenting States pursuant to its Article I powers except under the Bankruptcy Clause and citing *Central Va. Community College* v. *Katz*, 546 U. S. 356 (2006). See 583 S. W. 3d 221, 225–230 (Tex. App. 2018). The Supreme Court of Texas denied discretionary review.

After the decision below, this Court decided *PennEast*, 594 U. S. ___. There, we recognized that the States had waived their sovereign immunity as to the exercise of the federal eminent domain power under the structure of the Constitution pursuant to the "plan of the Convention." See *id.*, at ___ (slip op., at 14). We then granted Torres' petition for certiorari to decide whether, in light of that intervening decision, USERRA's damages remedy against state employers is constitutional.

II

Congress enacted USERRA as an exercise of its power

"[t]o raise and support Armies" and "[t]o provide and maintain a Navy." U. S. Const., Art. I, §8, cls. 12–13. The question before us is whether the Constitution allows Congress to enforce these federal reemployment protections by authorizing private litigation against noncompliant state employers that do not wish to consent to suit.

### A

The Constitution forged a Union, but it also protected the sovereign prerogatives of States within our government. Generally speaking, "the States entered the federal system with their sovereignty," including their sovereign immunity, "intact." *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991). Basic tenets of sovereign immunity teach that courts may not ordinarily hear a suit brought by any person against a nonconsenting State. See *ibid.*

But States still remain subject to suit in certain circumstances. States may, of course, consent to suit. See *Sossamon* v. *Texas*, 563 U. S. 277, 284 (2011). Congress may also enact laws abrogating their immunity under the Fourteenth Amendment. See *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 456 (1976). And, as relevant here, States may be sued if they agreed their sovereignty would yield as part of the "plan of the Convention," *PennEast*, 594 U. S., at ___ (slip op., at 15)—that is, if "the structure of the original Constitution itself" reflects a waiver of States' sovereign immunity, *Alden*, 527 U. S., at 728. "[A]ctions do not offend state sovereignty" if "the States consented" to them "at the founding." *PennEast*, 594 U. S., at ___ (slip op., at 23).

Alexander Hamilton described three circumstances where the "plan of the Convention" implied that the States waived their sovereign immunity: "where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance an authority to the Union and in another prohibited the States from exercising the like authority; and where it granted an authority to the

Opinion of the Court

Union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant*." The Federalist No. 32, p. 200 (J. Cooke ed. 1961) (emphasis in original); see *id.*, No. 81, at 548–549 (A. Hamilton).

Consistent with these principles, this Court has found structural waiver as to suits between States, in *South Dakota* v. *North Carolina*, 192 U. S. 286 (1904), and suits by the United States against a State, in *United States* v. *Texas*, 143 U. S. 621 (1892). The States, we said, must have recognized that these waivers of immunity from suit were "a necessary feature of the formation of a more perfect Union" and thus "inherent in the constitutional plan." *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 329 (1934). The alternative to consenting to litigation between sovereigns, after all, could be civil war.

A century later, in *Central Va. Community College* v. *Katz*, 546 U. S. 356, the Court recognized another structural waiver. We held that States could not assert sovereign immunity to block suits by private parties pursuant to federal bankruptcy laws. *Id.,* at 359. There, too, we based our holding on the constitutional structure. We noted the text's insistence on "uniform Laws on the subject of Bankruptcies," U. S. Const., Art. I, §8, cl. 4, the Framers' concerns about States' passing patchwork legislation and refusing to discharge the debts of noncitizens (as had happened under the Articles of Confederation), and the history of habeas laws related to bankruptcy. See 546 U. S., at 368–377. All that evidence led us to conclude that, by ratifying the Constitution, the States had agreed that their sovereignty would yield to ensure the effectiveness of national bankruptcy policy. See *id.,* at 379.

For several years, both before and after *Katz*, the Court declined to acknowledge additional waivers of sovereign immunity under Congress' Article I powers or to find Article I authority to abrogate immunity. See, *e.g., Seminole Tribe*

*of Fla.* v. *Florida*, <u>517 U. S. 44</u> (1996); *Florida Prepaid Post-secondary Ed. Expense Bd.* v. *College Savings Bank*, <u>527 U. S. 627</u> (1999). Two Terms ago, we even described *Katz'*s analysis as "good for one clause only," suggesting we would not find further waivers under Article I. *Allen* v. *Cooper*, 589 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 9) (hyphens omitted).

Last Term, in *PennEast Pipeline Co.* v. *New Jersey*, 594 U. S. \_\_\_, we considered whether Congress could, pursuant to its eminent domain power, authorize private parties to sue States to enforce federally approved condemnations necessary to build interstate pipelines. We held that "when the States entered the federal system, they renounced their right to the 'highest dominion in the[ir] lands,'" meaning they agreed their "eminent domain power would yield to that of the Federal Government." *Id.,* at \_\_\_–\_\_\_ (slip op., at 15–16) (quoting *Cherokee Nation* v. *Southern Kansas R. Co.*, <u>135 U. S. 641, 656</u> (1890)). Congress could therefore authorize private actions against States.

*PennEast* defined the test for structural waiver as whether the federal power at issue is "complete in itself, and the States consented to the exercise of that power—in its entirety—in the plan of the Convention." 594 U. S., at \_\_\_ (slip op., at 22) (internal quotation marks and citation omitted). Where that is so, the States implicitly agreed that their sovereignty "would yield to that of the Federal Government 'so far as is necessary to the enjoyment of the powers conferred upon it by the Constitution.'" *Id.,* at \_\_\_ (slip op., at 16) (quoting *Kohl* v. *United States*, <u>91 U. S. 367, 372</u> (1876)). By committing not to "thwart" or frustrate federal policy, the States accepted upon ratification that their "consent," including to suit, could "never be a condition precedent to" Congress' chosen exercise of its authority. 594 U. S., at \_\_\_, \_\_\_ (slip op., at 8, 10) (internal quotation marks omitted). The States simply "have no immunity left to waive or abrogate." *Id.,* at \_\_\_ (slip op., at 22).

Opinion of the Court

## B

Congress' power to build and maintain the Armed Forces fits *PennEast*'s test.  The Constitution's text, its history, and this Court's precedents show that "when the States entered the federal system, they renounced their right" to interfere with national policy in this area.  *Id.,* at ___ (slip op., at 15).

For one thing, the Constitution's text, across several Articles, strongly suggests a complete delegation of authority to the Federal Government to provide for the common defense.  Unlike most of the powers given to the National Government, the Constitution spells out the war powers not in a single, simple phrase, but in many broad, interrelated provisions.  The Preamble makes the "common defence" one of the document's central projects.  Article I gives Congress authority to "provide for th[at] common Defence" in six numbered paragraphs: to "declare War"; "raise and support Armies"; "provide and maintain a Navy"; "make Rules" for the Armed Forces; "provide for calling forth the Militia"; and "provide for [their] organizing, arming, and disciplining."  §8, cls. 1, 11–16.  Article II makes the President the "Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States."  §2, cl. 1.  And the Federal Government is charged with "protect[ing] each" State "against Invasion."  Art. IV, §4.

The Constitution also divests the States of like power.  States may not "engage in War, unless actually invaded," "enter into any Treaty," or "keep Troops, or Ships of War in time of Peace."  Art. I, §10, cls. 1, 3.  States retain a role in "the Appointment of the Officers" to and the "training [of] the Militia," but that delegation is strictly cabined.  Art. I, §8, cl. 16.  States must do so "according to the discipline prescribed by Congress."  *Ibid.*  These substantial limitations on state authority, together with the assignment of sweeping power to the Federal Government, provide strong evidence that the structure of the Constitution prevents

States from frustrating national objectives in this field.

History teaches the same lesson. "When the Framers met in Philadelphia in the summer of 1787, they sought to create a cohesive national sovereign in response to the failings of the Articles of Confederation." *PennEast*, 594 U. S., at ___ (slip op., at 22). The Founders recognized, first and foremost, "that the confederation produced no security agai[nst] foreign invasion; congress not being permitted to prevent a war nor to support it by the[ir] own authority," because Congress lacked the power to marshal and maintain a fighting force "fit for defence." 1 Records of the Federal Convention of 1787, p. 19 (M. Farrand ed. 1966) (Edmund Randolph opening remarks) (alterations in original).

"[T]he want of power in Congress to raise an army" had left the National Government "dependen[t] upon the States" to supply military forces via a system of quotas and requisition that had nearly cost the Nation victory in the Revolutionary War. *Selective Draft Law Cases*, 245 U. S. 366, 381 (1918). George Washington warned from the battlefield that, unless Congress is "vested with powers by the several States" to raise an army, "our cause is lost." Letter to J. Jones (May 31, 1780), in 8 Writings of George Washington 304 (W. Ford ed. 1890). In short, "[t]he experience of the whole country, during the revolutionary war, established, to the satisfaction of every statesman, the utter inadequacy and impropriety of this system of requisition." 3 J. Story, Commentaries on the Constitution of the United States §1174, p. 65 (1833) (Story). The need to fix that failing by establishing a strong national power to raise and maintain a military was one of the "recognized necessities" for calling the Constitutional Convention. *Selective Draft Law Cases*, 245 U. S., at 381.

The Constitution, by design, worked "an entire change in the first principles of the system." The Federalist No. 23, at 148 (A. Hamilton). The Framers gave Congress direct power over the "*formation, direction* or *support* of the

NATIONAL FORCES." *Ibid.* (emphasis in original). So "general and indefinite" were these powers vis-à-vis the States that "[o]bjections were made against" them as "subversive of the state governments," which retained "no control on congress" under the new arrangement. 3 Story §§1176, 1177, at 67. Some state conventions pitched proposals to limit the reach of Congress' war powers, but those amendments "die[d] away." *Id.*, §1186, at 74. The States ultimately ratified the Constitution knowing that their sovereignty would give way to national military policy.

Consistent with that structural understanding, Congress has, since the founding era, directed raising and maintaining the national military, including at the expense of state sovereignty. For instance, early Congresses established military bonuses to reward service, even requiring Virginia to give land to some Revolutionary War officers. See Act of Aug. 10, 1790, 1 Stat. 182. Could Virginia have refused to go along? We do not think so.

As President Lincoln reflected while the Civil War raged: The federal power to raise and maintain a military "'is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; . . . it is a power to raise and support armies given to Congress by the Constitution, without an "if."'" *Lichter* v. *United States*, 334 U. S. 742, 757, n. 4 (1948) (quoting 9 J. Nicolay & J. Hay, Complete Works of Abraham Lincoln 75–77 (1894)).

An unbroken line of precedents supports the same conclusion: Congress may legislate at the expense of traditional state sovereignty to raise and support the Armed Forces. During the Civil War, this Court rejected a State's attempt to retrieve, through habeas corpus, a deserted soldier "held in the custody of a recruiting officer of the United States." *Tarble's Case*, 13 Wall. 397, 398 (1872). The "National government['s] . . . power 'to raise and support armies'" cannot be "question[ed by] any State authority," we said. *Id.*, at 408. In *Stewart* v. *Kahn*, 11 Wall. 493 (1871),

the Court approved a federal statute that, among other pro-
visions, tolled state statutes of limitations in state courts
for suits against soldiers while they were in service of the
Union.    The Court described Congress' authority as
"carr[ying] with it inherently the power" to "remedy" state
efforts to frustrate national aims; objections sounding in or-
dinary federalism principles were "untenable." *Id.,* at 507.

In the early 20th century, the Court again rejected state-
sovereignty objections in this area, this time to the draft.
See *Selective Draft Law Cases*, 245 U. S., at 381.  We wrote
that Congress' authority to raise armies could not be quali-
fied or restricted by the States because the Constitution
"manifestly intended to give . . . all" such power to the Fed-
eral Government and "leave none to the States." *Ibid.*

Modern examples illustrate the same structural point.  In
*United States* v. *Oregon*, 366 U. S. 643, 644–649 (1961), this
Court rejected a State's Tenth Amendment challenge to a
federal law providing that, when certain veterans die with-
out heirs, their property distributes to veterans' facilities
rather than escheating to the State.  Even though estate
and property law are areas "normally left to the States," the
Court explained that those background assumptions are
displaced when it comes to Congress' "constitutional powers
to raise armies and navies." *Id.,* at 648–649.  When, years
later, the Court adopted a broader view of state sovereignty
under the Tenth Amendment, the Court was careful to clar-
ify that "[n]othing we say in this opinion addresses the
scope of Congress' authority under its war power." *National
League of Cities* v. *Usery*, 426 U. S. 833, 854–855, n. 18
(1976), overruled on other grounds, *Garcia* v. *San Antonio
Metropolitan Transit Authority*, 469 U. S. 528 (1985).

Nor is the Federal Government's power limited to the
"context of an actual war," as we held more recently in *Per-
pich* v. *Department of Defense*, 496 U. S. 334, 349 (1990).
After the Governors of California and Maine refused to al-
low their States' National Guard members to be sent on

Opinion of the Court

training missions in Honduras, Congress eliminated the longstanding requirement that the military obtain consent from the relevant Governor before transferring National Guard members to active military service. *Id.,* at 346. The Court rejected the notion that so holding "nullif[ied] an important state power," instead "recogniz[ing] the supremacy of federal power in the area of military affairs." *Id.,* at 351.

The lesson we draw from these cases is that "'[t]he power to wage war is the power to wage war successfully.'" *Lichter*, 334 U. S., at 780 (quoting address by C. Hughes, War Powers Under the Constitution (Sept. 5, 1917)). The Framers "'had emerged from a long struggle which had taught them the weakness of a mere confederation,'" so "'they established a Union which could fight with the strength of one people under one government entrusted with the common defence.'" *Ibid.* Under our constitutional order, States may not place any "'limitations inconsistent'" with Congress' power because "'every resource of the people must be at command.'" *Ibid.* In short, the States agreed to "dives[t]" themselves of "the traditional diplomatic and military tools that . . . sovereigns possess"—to sacrifice their sovereignty for the common defense. *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019) (slip op., at 13).

It follows that Congress' power to build and maintain a national military is "complete in itself." *PennEast*, 594 U. S., at ___ (slip op., at 22) (internal quotation marks omitted). Text, history, and precedent show the States agreed that their sovereignty would "yield . . . so far as is necessary" to national policy to raise and maintain the military. *Id.*, at ___ (slip op., at 16) (internal quotation marks omitted). And because States committed themselves not to "thwart" the exercise of this federal power, "[t]he consent of a State," including to suit, "can never be a condition precedent to [Congress'] enjoyment" of it. *Id.*, at ___, ___ (slip op., at 8, 10) (internal quotation marks omitted). We consequently hold that, as part of the plan of the Convention, the

States waived their immunity under Congress' Article I power "[t]o raise and support Armies" and "provide and maintain a Navy." §8, cls. 12–13.

### III

Neither Texas nor the dissent persuades us otherwise. Texas asserts that "Congress cannot abrogate state sovereign immunity through the exercise of Article I powers." Brief for Respondent 33. But, as explained, "congressional abrogation is not the only means of subjecting States to suit. . . . States can also be sued if they have consented to suit in the plan of the Convention." *PennEast*, 594 U. S., at ___ (slip op., at 15). We recognize that waiver today, as we have before in *PennEast* and *Katz*.

The dissent (but not Texas) adds that Congress needed to speak more clearly to subject Texas to suit because USERRA could be read to incorporate state law, perhaps including Texas' immunity laws. See *post*, at 5–7 (opinion of THOMAS, J.). But USERRA's text is clear: Congress sought to authorize suits against state employers. The very provision to which the dissent cites is entitled "Enforcement of rights with respect to a State or private employer." 38 U. S. C. §4323. USERRA elsewhere expressly "supersedes any State law . . . that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit." §4302(b). Congress' clarification that suits proceed "in a State court of competent jurisdiction in accordance with the laws of the State" merely addresses the fact that USERRA suits must be brought in state (rather than federal) court. §4323(b)(2). Under Supremacy Clause principles, Texas courts may not enforce contrary state laws to block these suits. Cf. *Testa* v. *Katt*, 330 U. S. 386, 390–394 (1947).

Texas and the dissent go on to suggest that the fact that an area of law "is under the exclusive control of the Federal

Opinion of the Court

Government" is not alone sufficient to do away with sovereign immunity. *Seminole Tribe*, 517 U. S., at 72; see *post*, at 11–12. We agree. In *Seminole Tribe*, we held that Congress could not rely on its Article I commerce powers to abrogate state sovereign immunity simply because that power was exclusive. 517 U. S., at 72. But later, in *PennEast*, we found that the federal eminent domain power was "'complete in itself,'" and held that *was* enough to find a waiver of sovereign immunity in the constitutional structure. 594 U. S., at ___ (slip op., at 22). It thus matters to the analysis that federal regulation of commerce (at issue in *Seminole Tribe*) involves goods that, before they travel between States or outside a tribe, are subject to regulation by a sovereign other than the Federal Government (a State or tribe). That feature of commerce arguably makes the federal regulatory power less than "complete." The dissent takes issue with this "complete in itself" inquiry. See *post*, at 21–29. But its quarrel lies with *PennEast*, which used the formulation we rely upon today.

In any event, the text, history, and precedent we have described indicate that an assertion of state sovereignty to frustrate federal prerogatives to raise and maintain military forces would be strongly "*contradictory* and *repugnant*" to the constitutional order. The Federalist No. 32, at 200 (A. Hamilton) (emphasis in original). Neither *Seminole Tribe* nor the cases that followed it, such as *Florida Prepaid*, 527 U. S. 627, considered federal powers that give rise to these same structural inferences. None of those powers (*e.g.,* Indian commerce, interstate commerce, or intellectual property) is expressly denied to the States, or operates for the benefit of the entire Nation, or proves comparably essential to the survival of the Union—itself a foundational purpose for drafting the Constitution. See Brief for United States as *Amicus Curiae* 30–31. These factors, taken together, lead us to conclude that the results in *PennEast* and *Katz*, not dicta in *Seminole Tribe*, control this case.

Opinion of the Court

The dissent makes two further points. First, it quotes *Alden* v. *Maine* for the proposition that "'the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts.'" *Post*, at 1, 8–9 (quoting 527 U. S., at 712; emphasis deleted). But the dissent would give this sentence more weight than it can bear. The quoted passage appears in the introduction to the Court's opinion, and it refers summarily to Article I's general delegations (*i.e.,* Congress' broad authority under the Supremacy Clause and the Necessary and Proper Clause). See *Alden,* 527 U. S., at 712; see also *id.,* at 731–733 (discussing same). *Alden* did not, in this sentence or elsewhere, suggest that there were no exceptions under which Congress could authorize private suits against States. In fact, *Alden* said the opposite. The Court expressly embraced "'the postulate that States . . . shall be immune from suits, without their consent, *save where there has been "a surrender of this immunity in the plan of the convention."'" Id.,* at 730 (quoting *Principality of Monaco*, 292 U. S., at 322–323, in turn quoting The Federalist No. 81; emphasis added). So, *Alden* made clear: "In exercising its Article I powers Congress *may* subject the States to private suits in their own courts . . . if there is 'compelling evidence' that the States were required to surrender this power to Congress pursuant to the Constitutional design." 527 U. S., at 730–731 (quoting *Blatchford*, 501 U. S., at 781; emphasis added). As we have discussed, *PennEast* and *Katz* recognize such exceptions as to the federal eminent domain power and the Bankruptcy Clause. And they establish the test for what constitutes "compelling evidence" of structural waiver.

The dissent next implies that *PennEast* and *Katz* create special rules regarding waivers of sovereign immunity in federal courts that do not apply in state courts. See *post*, at

Opinion of the Court

9–10, and n. 4, 16–17, and n. 7. But those opinions' reasoning about our constitutional structure is not so limited, as *Alden* reflects. *Alden* held that Article I did not, in general, give Congress the power to set aside States' immunity from suit in their own courts, despite the Eleventh Amendment's silence on the subject of state courts. (The Amendment's text refers only to federal courts—"The Judicial power of the United States.") Like our other state sovereign immunity cases, *Alden* "understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms." *Blatchford*, 501 U. S., at 779; see *Alden*, 527 U. S., at 755 (explaining its holding is "implicit in the constitutional principle of state sovereign immunity"). It follows that a waiver pursuant to the plan of the Convention, as we found in *PennEast* and *Katz*, displaces the background principles of state sovereign immunity wherever those suits proceed. Neither *Alden* nor any other case holds to the contrary.

The dissent would leave us with a constitutional structure that allows Congress to authorize private suits against States only by abrogation under the Fourteenth Amendment, by legislation under the Bankruptcy Clause (but only for suits in federal courts), or by delegation of the federal eminent domain power (but, again, only in federal courts). The logic of that constitutional design is anything but clear.

Texas tries another tack to distinguish *PennEast* and *Katz*, focusing on a technical aspect of those cases. Texas says that both eminent domain and bankruptcy involved *in rem* proceedings, which are "'inextricably intertwined'" with the exercise of those federal powers. See Brief for Respondent 40 (quoting *PennEast*, 594 U. S., at ___ (slip op., at 17)); see also *post*, at 23–24. The proceeding before us, Texas adds, is not *in rem* or so intertwined. We agree, of course, that *PennEast* discussed the close connection between the exercise of eminent domain and condemnation actions. See 594 U. S., at ___ (slip op., at 17); see also *Katz*,

Opinion of the Court

546 U. S., at 369–372. But we read *PennEast* as resting on a broader point: The Federal Government's eminent domain power is complete, such that no State may frustrate its exercise by claiming immunity to forestall the transfer of property. And that conclusion applies equally to Congress' powers to raise and maintain the military.

Texas further argues that Congress cannot subject it to suit under USERRA because there is no founding-era history of similar litigation against States. See Brief for Respondent 25. But *PennEast* did not require any such history, as the dissent acknowledges. 594 U. S., at ___ (slip op., at 19) (citing *Texas*, 143 U. S., at 646); see *post*, at 14, n. 6. Again, in *PennEast*, we considered the inferences that flow from our constitutional structure and asked whether States may, consistent with that structure, claim immunity to frustrate federal objectives. And again, answering that question here, we find that the States waived their immunity under Article I, §8, cls. 12 and 13.

Texas' contrary view would permit States to thwart national military readiness. We need not stray from the statute at hand to see the danger of this approach. If a State— or even 25 States—decided to protest a war by refusing to employ returning servicemembers, Congress, on Texas' telling, would be powerless to authorize private reinstatement suits against those States. The potentially debilitating effect on national security would not matter.

We think it does matter for a simple reason. Text, history, and precedent show that the States, in coming together to form a Union, agreed to sacrifice their sovereign immunity for the good of the common defense.

\*    \*    \*

We consequently reverse the judgment of the Texas Court of Appeals and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Cite as: 597 U. S. ____ (2022)          1

KAGAN, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–603

_____

## LE ROY TORRES, PETITIONER *v.* TEXAS DEPARTMENT OF PUBLIC SAFETY

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF TEXAS, THIRTEENTH DISTRICT

[June 29, 2022]

JUSTICE KAGAN, concurring.

In my view, our sovereign immunity decisions have not followed a straight line. Two years ago, I described *Katz*'s "plan of the Convention" analysis as "good for one clause only"—*i.e.*, Article I's Bankruptcy Clause. *Allen* v. *Cooper*, 589 U. S. ___, ___–___ (2020) (slip op., at 8–9) (hyphens omitted); see *Central Va. Community College* v. *Katz*, 546 U. S. 356, 373–379 (2006). I thought then that our precedents had shut the door on further Article I exceptions to state sovereign immunity. But *PennEast* proved me wrong. See *PennEast Pipeline Co.* v. *New Jersey*, 594 U. S. ___ (2021). The question there was whether the States had consented in the plan of the Convention to the Federal Government's exercise of Article I's eminent domain power, including through private parties' suits. Relying on our prior decisions, I concluded that the States had not so consented. See *id.*, at ___–___ (BARRETT, J., dissenting) (slip op., at 1–4). But the Court ruled otherwise. Using a new test, it held that the eminent domain power was "complete in itself," meaning that the States had "consented to the [federal] exercise of that power[] in its entirety." *Id.*, at ___ (slip op., at 22). The question today, given *PennEast*, is whether the same is true of the war powers. Were those powers also "complete in themselves," so that the States likewise consented to congressionally authorized private litigation?

2      TORRES *v.* TEXAS DEPARTMENT OF PUBLIC SAFETY

KAGAN, J., concurring

The answer is yes, as the Court holds. Much more than eminent domain, war powers lie at the heart of the Convention's plan. The overriding goal of the Convention was "to create a cohesive national sovereign in response to the failings of the Articles of Confederation." *Ibid.* And among those failings, none was more important than "the want of power in Congress to raise an army and the dependence upon the States" to provide armed forces. *Selective Draft Law Cases*, 245 U. S. 366, 381 (1918). For that reason, the war powers—more than any other power, and surely more than eminent domain—were "complete in themselves." They were given by the States, entirely and exclusively, to the Federal Government. See *ante*, at 7–12; U. S. Const., Art. I, §8, cls. 11–16, §10, cls. 1, 3. *PennEast*'s analysis thus compels today's result. In setting out the "complete in itself" test, the Court there answered the question here: At the Convention, the States waived their sovereign immunity to any suit Congress authorized under the war powers.

Cite as: 597 U. S. ____ (2022)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–603

_____

## LE ROY TORRES, PETITIONER *v.* TEXAS DEPARTMENT OF PUBLIC SAFETY

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF TEXAS, THIRTEENTH DISTRICT

[June 29, 2022]

JUSTICE THOMAS, with whom JUSTICE ALITO, JUSTICE GORSUCH, and JUSTICE BARRETT join, dissenting.

More than two decades ago, this Court found it "difficult to conceive that the Constitution would have been adopted if it had been understood to strip the States of immunity from suit in their own courts and cede to the Federal Government a power to subject nonconsenting States to private suits in these fora." *Alden* v. *Maine*, 527 U. S. 706, 743 (1999). Accordingly, we held—without qualification—that "the powers delegated to Congress under Article I of the United States Constitution *do not include* the power to subject nonconsenting States to private suits for damages in state courts." *Id.,* at 712 (emphasis added).

No longer. Today, by adopting contrived interpretations of *Alden* and the recent decision in *PennEast Pipeline Co.* v. *New Jersey*, 594 U. S. ___ (2021), the Court holds that at least two (and perhaps more) Article I "war powers" do, in fact, include "the power to subject nonconsenting States to private suits for damages in state courts," *Alden*, 527 U. S., at 712, and that Congress has exercised that power by enacting the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U. S. C. §4301 *et seq. Alden* should have squarely foreclosed that holding. As the Court there already explained, constitutional text,

THOMAS, J., dissenting

history, and precedent all show that when the States ratified the Constitution, they did not implicitly consent to private damages actions filed in their own courts—whether authorized by Congress' war powers or any other Article I power.  Because the Court today holds otherwise, I respectfully dissent.

## I

After declaring independence, the former Colonies "considered themselves fully sovereign nations." *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019) (slip op., at 6).  And, when the States ratified the Constitution, "they entered the Union 'with their sovereignty intact,'" *Federal Maritime Comm'n* v. *South Carolina Ports Authority*, 535 U. S. 743, 751 (2002) (quoting *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775, 779 (1991)), retaining "a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status," *Alden*, 527 U. S., at 714.

"'An integral component' of the States' sovereignty was 'their immunity from private suits'" absent consent.  *Franchise Tax Bd.*, 587 U. S., at ___ (slip op., at 6) (quoting *Federal Maritime Comm'n*, 535 U. S., at 751–752).  That "doctrine . . . was universal in the States when the Constitution was drafted and ratified," *Alden,* 527 U. S., at 715–716; see also *Hans* v. *Louisiana*, 134 U. S. 1, 16 (1890), because "[t]he generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity," 527 U. S., at 715; see also, *e.g., Federal Maritime Comm'n*, 535 U. S., at 760.  In fact, sovereign immunity was so important that "[t]he Constitution never would have been ratified if the States and their courts were to be stripped of their sovereign authority except as expressly provided by the Constitution itself."  *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 239, n. 2 (1985); see also *Ex parte New York*, 256 U. S. 490, 497 (1921);

THOMAS, J., dissenting

*Alden*, 527 U. S., at 716.

Although States generally retained their immunity from suit, "in ratifying the Constitution, [they] did surrender a portion of their inherent immunity." *Federal Maritime Comm'n*, 535 U. S., at 752. As Alexander Hamilton explained in The Federalist, sovereign immunity was part of "the general sense and the general practice of mankind," and the Constitution therefore left it "with the States" unless they had "surrender[ed]" some portion "of this immunity in the plan of the convention." The Federalist No. 81, pp. 487–488 (C. Rossiter ed. 1961); see also *Hans*, 134 U. S., at 13; *Alden*, 527 U. S., at 755.

During the Nation's first 200 years, this Court recognized only two instances in which the States had surrendered their sovereign immunity in the constitutional plan, both of which involved suits prosecuted by other sovereigns. The States had agreed to be sued by other States in this Court, see *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 328 (1934), and by the United States in federal court, see *United States* v. *Texas*, 143 U. S. 621, 644–645 (1892); *Franchise Tax Bd.*, 587 U. S., at ___–___ (slip op., at 9–10). When it came to *private* litigation, however, this Court long maintained that "the Framers thought it an impermissible affront to a State's dignity to be required to answer the complaints of private parties in federal courts," *Federal Maritime Comm'n*, 535 U. S., at 760, and that "the Convention did not disturb States' immunity from private suits," *id.*, at 752.

Nevertheless, in the last two decades, the Court has recognized two surrenders of sovereign immunity in cases implicating private parties. First, in *Central Va. Community College* v. *Katz*, 546 U. S. 356 (2006), this Court held that States waived immunity against the federal discharge of debts when they ratified the Bankruptcy Clause. And, in *PennEast*, 594 U. S. ___, it held that States waived immunity against condemnation proceedings brought by private

parties to whom the Federal Government has delegated its eminent domain power. Taken together, *Katz* and *Penn-East* centered on whether or not the plan of the Convention—*i.e.,* the Constitution itself—required States to surrender their sovereign immunity. See *Katz*, 546 U. S., at 379; *PennEast*, 594 U. S., at ___ (slip op., at 15).

These cases contrast with those that involve congressional "abrogation" of state sovereign immunity. Abrogation rests on some "statement Congress ha[s] made on the subject of state sovereign immunity." *Katz*, 546 U. S., at 378–379. Specifically, we have held that Congress must enact "unequivocal statutory language" abrogating States' immunity. *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 56 (1996) (internal quotation marks omitted). That said, the line between "plan-of-the-Convention waiver" and "congressional abrogation" is a murky one. Both inquiries ask the same basic question: whether Congress has authorized suit against a nonconsenting State pursuant to "a valid exercise of constitutional authority." *Kimel* v. *Florida Bd. of Regents*, 528 U. S. 62, 78 (2000); see also *Katz*, 546 U. S., at 379 (asking whether Congress' decision to bind States to discharge orders in bankruptcy proceedings is "within the scope of its power to enact 'Laws on the subject of Bankruptcies'"). And both inquiries center on "history, practice, precedent, and the structure of the Constitution," *Alden*, 527 U. S., at 741, to determine whether the Constitution either grants authority to Congress to abrogate immunity or strips States of their immunity on its own.

The parties agree that this case involves only plan-of-the-Convention waiver. Thus, the question presented is whether, in ratifying the Constitution, the States surrendered their immunity in their own courts against private damages actions authorized by Congress' war powers.

THOMAS, J., dissenting

## II

In answering that question, the Court discounts two important points. First, it creates a constitutional problem by adopting a questionable interpretation of USERRA that assumes Congress intended to legislate with indifference to States' state-law immunity. Second, the Court cannot escape the fact that *Alden* already answered the question presented and held that the States did not surrender their state-court immunity when ratifying Article I of the Constitution.

## A

When it was originally enacted, USERRA authorized covered employees to sue States in federal district court. See 38 U. S. C. §4323(b) (1994 ed.). In 1996, this Court decided *Seminole Tribe*, holding that Congress could not abrogate state sovereign immunity in federal courts using its Article I powers. See 517 U. S*.,* at 72–73. In response to *Seminole Tribe*, Congress amended USERRA in 1998, and the statute now provides: "In the case of an action against a State (as an employer) by a person, the action may be brought in a State court of competent jurisdiction *in accordance with the laws of the State*." §4323(b)(2) (emphasis added).

USERRA's requirement that employee damages actions be "in accordance with the laws of the State" would seem to include a State's "laws" that render it immune from suit in the State's own courts, as well as any "laws" that expressly waive such immunity. See, *e.g.,* Tex. Govt. Code Ann. §311.034 (West 2013); *Prairie View A & M Univ.* v. *Chatha*, 381 S. W. 3d 500, 512 (Tex. 2012). In other words, there is nothing in the text of USERRA necessarily implying that Congress intended to require *nonconsenting* States to defend themselves in their own courts.[1] The Court, however,

_____

[1] To be sure, if USERRA authorizes suits in state courts only "in accordance with the laws of the State," the ability to bring such actions would vary by State—some States would consent to suit, others would

THOMAS, J., dissenting

breezes past USERRA's language to conclude that the statute "authoriz[es] private litigation against noncompliant state employers that do not wish to consent to suit." *Ante,* at 4.[2]

To be clear, I am not disputing whether USERRA speaks clearly enough to express a congressional intent to "abrogate" the States' sovereign immunity in their own courts; plan-of-the-Convention waiver asks whether the States surrendered that immunity when the Constitution was ratified and thus "agreed . . . not to assert that immunity" in particular contexts. *Katz*, 546 U. S., at 373. But even if the Constitution itself partially strips state sovereign immunity, it would still fall to Congress to decide whether, and on what terms, to render States amenable to suit, or to permit States to assert immunity. Cf. *id.,* at 379 ("Congress may, at its option, either treat States in the same way as other

---

not, and still others would be amenable to suit under the Supremacy Clause because their state courts were authorized to hear analogous state-law actions against the State. See, *e.g., Testa* v. *Katt*, 330 U. S. 386, 394 (1947). But there is nothing strange about that lack of uniformity; in fact, a House Subcommittee considering the effect of *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996), on USERRA heard testimony suggesting that might be how things worked if covered employees sued in state courts. See Hearing on USERRA et al. before the Subcommittee on Education, Training, Employment and Housing of the House Committee on Veterans' Affairs, 104th Cong., 2d Sess., 90 (1996) (explaining that "the rights of state employees to recover under the USERRA might vary from state to state").

   [2] The Court invokes 38 U. S. C. §4302(b) to bolster its interpretation of §4323, see *ante,* at 12, but that provision supersedes only those state laws that abridge the "right[s]" and "benefit[s]" defined in §4303(2). §4302(b). Those "rights and benefits" are "all substantive rights"; they do not "deal with the procedure or process for enforcing those rights and benefits." *Wysocki* v. *International Bus. Machine Corp.*, 607 F. 3d 1102, 1106–1107 (CA6 2010). Meanwhile, §4323 clearly applies to procedure and process and its plain text—"in accordance with the laws of the State"—gives no hint that Congress meant to supersede state laws governing state sovereign immunity in state courts.

THOMAS, J., dissenting

creditors insofar as concerns 'Laws on the subject of Bankruptcies' or exempt them from the operation of such laws").

The Court should not casually consider the constitutionality of USERRA's supposed subjection of nonconsenting States to damages actions in state court when it is not clear the statute does any such thing. By doing so, the Court gives short shrift to the "well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 205 (2009) (internal quotation marks omitted).

### B

Having interpreted USERRA to render nonconsenting States amenable to suit, the Court goes on to distinguish *Alden* v. *Maine* without any plausible basis for doing so. In truth, *Alden* directly controls this case.

In *Alden*, a group of private plaintiffs sued the State of Maine in state court, invoking a private cause of action created by the Fair Labor Standards Act (FLSA). See 527 U. S., at 711–712. The question presented was "whether Congress has the power, under Article I, to subject nonconsenting States to private suits in their own courts." *Id.,* at 730. In a detailed opinion, the Court in *Alden* held—without qualification—that the States had not consented in the plan of the Convention to *any* congressionally created private damages actions in state court.

To begin, *Alden* framed its inquiry around plan-of-the-Convention waiver, not congressional abrogation: "In exercising its Article I powers Congress may subject the States to private suits in their own courts only if there is compelling evidence that the States *were required to surrender this power to Congress pursuant to the constitutional design*"—

*i.e.,* in the plan of the Convention. *Id.,* at 730–731 (emphasis added; internal quotation marks omitted); see also *ante,* at 4. In determining whether such evidence existed, *Alden* began with the text of the Constitution. See 527 U. S., at 731. It recognized that Article I, §8, "grants . . . Congress broad powers to enact legislation in several enumerated areas of national concern"—including, of course, the war powers. *Ibid.* But neither the breadth of those powers nor their connection to "areas of national concern" sufficed to show that States ratified the Constitution with the understanding that they had surrendered to Congress any power to authorize private damages actions against them in their own courts. See *id.,* at 731–733.

*Alden* spoke emphatically and categorically when explaining why the States had effected no such surrender. We found it telling that "no one, not even the Constitution's most ardent opponents, suggested the document might strip the States of the[ir] immunity" from suit "in their own courts." *Id.,* at 741. That was likely because "the sovereign's right to assert immunity from suit in its own courts was a principle so well established that *no one conceived it would be altered by the new Constitution.*" *Ibid.* (emphasis added). We explained how the founding generation's concern that "Article III might be used to circumvent state-court immunity" counseled against "infer[ring] that the Constitution stripped the States of immunity in their own courts and allowed Congress to subject them to suit there." *Id.,* at 743. Rather, in light of the historical record, we found it "difficult to conceive that the Constitution would have been adopted if it had been understood to strip the States of immunity from suit in their own courts and cede to the Federal Government a power to subject nonconsenting States to private suits in these fora." *Ibid.*

Importantly, the scope of *Alden*'s holding was broad: "We hold that the powers delegated to Congress under Article I of the United States Constitution do not include the power

THOMAS, J., dissenting

to subject nonconsenting States to private suits for damages in state courts." *Id.,* at 712; see also *id.,* at 754. That holding plainly applied to *all* Article I powers. Thus, we did not engage in a clause-by-clause parsing of Article I's various powers, nor did we even mention which Article I power authorized the FLSA. It did not matter because the States would not have surrendered to Congress *any* of the immunity they enjoyed in their own courts.

Finally, concluding its analysis, *Alden* contrasted the States' amenability to suit "by the United States on behalf of the employees" with a suit "by the employees" themselves, holding that "history, precedent, and the structure of the Constitution make clear that, *under the plan of the Convention,* the States have consented to suits of the first kind but not of the second." *Id.,* at 759–760 (emphasis added).[3] The question that *Alden* answered plainly embraces the one that the Court answers today. And there is no serious dispute that *Alden*'s explicit holding is irreconcilable with the Court's holding here.

\*  \*  \*

Until today, *Alden* meant what it said. Both *Katz* and *PennEast* considered plan-of-the-Convention waivers applicable to federal, not state, court. See *Katz,* 546 U. S., at 360; *PennEast,* 594 U. S., at ___ (slip op., at 4). Nothing in those

_____

[3]The Court ignores all of this and instead invokes inapposite language elsewhere in *Alden*. For instance, the Court emphasizes that *Alden* expressly recognized "'the postulate that States . . . shall be immune from suits, without their consent, *save where there has been "a surrender of this immunity in the plan of the convention."'"* *Ante,* at 14 (quoting *Alden,* 527 U. S., at 730). That is true enough, but beside the point. After stating this "postulate," *Alden* exhaustively evaluated constitutional history, precedent, and structure and expressly held that the States, "*under the plan of the Convention,* . . . have [not] consented to suits" filed by private individuals in state court. *Id.,* at 759–760 (emphasis added).

THOMAS, J., dissenting

decisions, therefore, undermined *Alden*'s categorical holding.[4]  It is only the Court's holding today that does so.  I would adhere to *Alden* and reaffirm that the States did not surrender the immunity applicable in their own courts when they delegated the enumerated powers—including the war powers—to Congress in Article I.  And, because Torres has not invoked a waiver of immunity under state law, I would affirm the judgment of the Texas Court of Appeals.

## III

Even if *Alden*'s holding were not alone dispositive, thus requiring us to consider our "plan of the Convention" precedents applicable to private actions *in federal court*, I would still conclude that the States have not waived their immunity to private damages actions authorized by the war powers.

---

[4] The Court asserts that "those opinions' reasoning . . . is not so limited" to render them inapplicable to state courts.  *Ante,* at 15.  But the reasoning in *Katz* is necessarily limited to federal courts, given that federal district courts have "original and exclusive jurisdiction" over all bankruptcy proceedings under Title 11.  28 U. S. C. §1334(a).  Nor is it probable that *PennEast* silently carved an exception from *Alden*'s categorical rule.  The Framers did not even think to address state sovereign immunity in state courts because "the sovereign's right to assert immunity from suit in its own courts was a principle so well established that no one conceived it would be altered by the new Constitution."  *Alden*, 527 U. S., at 741.  We should not read *PennEast* to establish, without discussion, something inconceivable to the founding generation.  See 527 U. S., at 743.

Similarly unconvincing is the Court's assumption that "waiver pursuant to the plan of the Convention," necessarily "displaces the background principles of state sovereign immunity wherever those suits proceed."  *Ante,* at 15.  For instance, we have held that "the only forums in which the States have consented to suits by one another and by the Federal Government *are Article III courts*."  *Franchise Tax Bd. of Cal.* v. *Hyatt*, 587 U. S. ___, ___ (2019) (slip op., at 10) (emphasis added).  A surrender of immunity in federal court therefore does not necessarily translate to a surrender of immunity in state court.

THOMAS, J., dissenting

Our settled test for plan-of-the-Convention waiver is a stringent one: We cannot infer a waiver of sovereign immunity unless there is "compelling evidence that the Founders thought such a surrender inherent in the constitutional compact." *Blatchford*, 501 U. S., at 781; see also *Alden*, 527 U. S., at 731. "Compelling evidence" of this sort includes "evidence of the original understanding of the Constitution," *id.,* at 741, "early congressional practice," *id.,* at 743, "the structure of the Constitution" itself, *id.,* at 748, and the "theory and reasoning of our earlier cases," *id.,* at 745; see also *id.,* at 754.

Applying this test, it is clear that the States did not implicitly agree to surrender their state-court immunity against congressional exercises of the war powers.

A

Torres claims (and the Court agrees) that the original understanding of the Constitution's text implies that the States agreed to surrender their immunity against private actions authorized by Congress' "war powers," which include eight powers enumerated in Article I, §8, along with the Necessary and Proper Clause. See Brief for Petitioner 4 (invoking Art. I, §8, cls. 1, 10–16, 18); see also *ante,* at 7 (listing Art. I, §8, cls. 1, 11–16). In support of that argument, Torres and the Court point out that the war powers delegated to Congress are sweeping, and that Article I, §10, expressly and completely divests States of various war-related powers. See *ante,* at 7–8; Brief for Petitioner 24. This argument falters on at least two fronts.

First, *Seminole Tribe* long ago explained that the breadth and exclusivity of a federal power does not authorize Congress to subject nonconsenting States to private damages actions. *Seminole Tribe* involved a federal cause of action created pursuant to Congress' authority under the Indian Commerce Clause, see 517 U. S., at 60, which this Court has said grants Congress "'plenary and exclusive'" "powers

THOMAS, J., dissenting

to legislate in respect to Indian tribes," *United States* v. *Lara*, 541 U. S. 193, 200 (2004). Although *Seminole Tribe* recognized that States had been "divested of virtually all authority over Indian commerce and Indian tribes," 517 U. S., at 62, the Court nonetheless held that "state sovereign immunity . . . is not so ephemeral as to dissipate when the subject of the suit is an area . . . that is under the exclusive control of the Federal Government," *id.,* at 72. That "the Constitution vests in Congress complete lawmaking authority over a particular area," we explained, does not implicitly authorize Congress to abrogate immunity with respect to that power. *Ibid.*[5]

Nor is the answer different when the exclusive federal exercise of a particular power is reinforced by an explicit divestment of state authority under Article I, §10. Our precedents teach that whenever a power is "exercised exclusively by Congress, the subject is as completely taken from the State Legislatures, *as if they had been expressly forbidden to act on it.*" *Sturges* v. *Crowninshield*, 4 Wheat. 122, 193 (1819) (Marshall, C. J., for the Court) (emphasis added). Whether or not a prohibition on state power *also* appears in Article I, §10, is irrelevant when deciding whether the Constitution has granted Congress power to subject nonconsenting States to private suits.

Second, even if express textual divestment of state power were relevant, Torres and the Court incorrectly conclude that the specific divestments listed in Article I, §10, "provide strong evidence" supporting "a complete delegation of authority to the Federal Government to provide for the common defense." *Ante,* at 7. States obviously have no authority to take certain actions specified in Article I, §10. They

_____

[5] It is true that *Seminole Tribe* purportedly addressed congressional abrogation of sovereign immunity, rather than plan-of-the-Convention waiver. But its logic applies equally to the latter context, especially given the murky line that our precedents draw between the two concepts. See *supra,* at 4.

THOMAS, J., dissenting

cannot, for example, "keep Troops, or Ships of War in time of Peace . . . unless actually invaded, or in such imminent Danger as will not admit of delay" without the consent of Congress. Art. I, §10, cl. 3. But to say that Congress' much more general authority to "raise and support Armies," Art. I, §8, cl. 12, acts to completely derogate all state authority related to the subject is inaccurate.

States have significant residual police powers that overlap with Congress' power over the military. For example, we have sustained state legislation related to the enlistment of men in the U. S. Army and Navy against the charge that "'all power of legislation regarding the subject matter . . . is conferred upon Congress and withheld from the States.'" *Gilbert* v. *Minnesota*, 254 U. S. 325, 327–328 (1920). In doing so, we rejected the idea "that a State has no interest or concern in the United States or its armies or power of protecting them from public enemies," and eschewed any "[c]old and technical reasoning" that "insist[s] on a separation of the sovereignties" in the army-raising context. *Id.,* at 328–329. Similarly, we have held that "there is no clause of the Constitution which purports, unaided by Congressional enactment, to prohibit" States from exercising their police powers in ways that arguably burden Congress' "power to raise and support armies." *Penn Dairies, Inc.* v. *Milk Control Comm'n of Pa.*, 318 U. S. 261, 269 (1943). Nor have we "implied from the relationship of the two governments established by the Constitution" any such prohibition. *Ibid.* State regulations "inevitably impos[e] some burdens on the national government," but those are the "normal incidents of the operation within the same territory of a dual system of government," and they may persist "save as Congress may act to remove them." *Id.,* at 271. Therefore, even though the Army and Navy Clauses grant Congress "exclusive" authority over raising and supporting armies and navies, that exclusivity is no different from that which attends any other Article I power.

THOMAS, J., dissenting

To nonetheless find plan-of-the-Convention waiver, as Torres proposes and the Court accepts, is to hold that a congressional power to pre-empt state law alone demonstrates a State's surrender of sovereign immunity. That line of reasoning, apart from being foreclosed by *Seminole Tribe*, proves too much. The upshot is that the States would have consented in the plan of the Convention to surrender their immunity against the exercise of *any* Article I power. Because such a result is a dramatic departure from our precedents, and the power granted to Congress under the Army and Navy Clauses does not displace state regulation any more readily or completely than other Article I powers, these arguments from constitutional text provide no sound basis for authorizing private actions against nonconsenting States.

## B

Constitutional history and practice do Torres and the Court no better. To begin, we must view the historical evidence in light of the "presumption that no anomalous and unheard-of proceedings or suits were intended to be raised up by the Constitution." *Hans*, 134 U. S., at 18; see also *Alden*, 527 U. S., at 727. Applying that presumption, the Court in the past has "attribute[d] great significance" to the absence of analogous suits "at the time of the founding or for many years thereafter." *Federal Maritime Comm'n*, 535 U. S., at 755.[6] Moreover, the presumption is arguably at its

——————
[6] It is true that the Court in *PennEast Pipeline Co.* v. *New Jersey*, 594 U. S. ___ (2021), found plan-of-the-Convention waiver even in "the absence of a perfect historical analogue" to private condemnation suits by federal delegatees against States. *Id.,* at ___ (slip op., at 19). But *PennEast* excused this absence of historically analogous actions because it refused to "divorce the eminent domain power from the power to bring condemnation actions," given that "the eminent domain power is inextricably intertwined with the ability to condemn," and "the federal eminent domain power was a means that was 'known and appropriate' at the time of the founding." *Id.,* at ___–___, ___ (slip op., at 16–17, 19). Thus, the

THOMAS, J., dissenting

strongest here, for private damages actions were precisely
"the type of proceedings from which the Framers would
have thought the States possessed immunity." *Id.,* at 756.
The Framers would have "thought it an impermissible af-
front to a State's dignity" to require it "to defend itself in an
adversarial proceeding against a private party." *Id.,* at
760–761.

To overcome that presumption, Torres and the Court in-
voke some historical sources that generally discuss the
scope and importance of Congress' war-related powers. See
Brief for Petitioner 26–37; *ante,* at 8–9. But virtually none
of them addresses directly the central question here:
whether the States understood that they had surrendered
their sovereign immunity from suit in their own courts
when delegating those powers to Congress. Instead, the
founding-era history is largely silent on this question, and
that "silence is most instructive" in confirming that "no one
conceived that [state sovereign immunity] would be altered
by the new Constitution['s]" distribution of war powers.
*Alden,* 527 U. S., at 741. "[T]he Founders' silence is best
explained by the simple fact that no one . . . suggested the
document might strip the States of [their] immunity" under
the war powers. *Ibid.*

More specifically, Torres (but not the Court) points to the
1783 Treaty of Paris. He maintains that private actions
would not have been anomalous to the Founders because
they expected British creditors to sue States under the
treaty in order to collect on their debts. See Brief for Peti-
tioner 27–31. But it is not likely that the Founders did, in
fact, expect foreign creditor suits against States; "it is more
likely that they expected creditors to sue their individual

---

*PennEast* holding turned on the unique connection between the eminent
domain power, the ability to initiate condemnation proceedings, and the
long history of Congress delegating its eminent domain to private par-
ties. See also *infra,* at 19–20.

debtors and rely on the Treaty to defeat any state law defenses." B. Clark, The Eleventh Amendment and the Nature of the Union, 123 Harv. L. Rev. 1817, 1910 (2010). And when the Eleventh Amendment was adopted "to restore the original constitutional design" after *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), *Alden*, 527 U. S., at 722, Congress refused "to make an exception for cases arising under treaties made under the authority of the United States," *id.,* at 721 (internal quotation marks omitted). "Congress' refusal to modify the text of the Eleventh Amendment to create an exception to sovereign immunity for cases arising under treaties" suggests that the States' immunity from private-party litigation extended even to treaty-based claims. *Id.,* at 735; see also D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 197 (1997).

Early congressional practice accords with the Framers' assumption that Congress could not use any Article I power to subject the States to private damages actions in their own courts. In fact, we already have "discovered no instance in which [early Congresses] purported to authorize suits against nonconsenting States in [state courts]." *Alden*, 527 U. S., at 744. Contrasted against the numerous statutes authorizing other federal suits in state courts, it "appears early Congresses did not believe they had the power to authorize private suits against the States in their own courts." *Ibid.*

## C

Constitutional structure also cuts decisively against inferring a surrender of state sovereign immunity in this context. See *id.,* at 748–754.

First and most fundamentally, all private suits against nonconsenting States present "'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Id.,* at 749 (quoting *In re Ayers*, 123 U. S. 443, 505 (1887)). USERRA's cause of action

Thomas, J., dissenting

is uniquely offensive to the States' dignity because it purports "to press a State's own courts into federal service to coerce the other branches of the State," thereby "turn[ing] the State against itself" and "commandeer[ing] the entire political machinery of the State against its will and at the behest of individuals." *Alden*, 527 U. S., at 749. That kind of "plenary federal control of state governmental processes denigrates the separate sovereignty of the States." *Ibid.*

Second, congressional authorization of private damages actions "threaten[s] the financial integrity of the States." *Id.,* at 750. It can "create staggering burdens" and give "Congress a power and a leverage over the States that is not contemplated by our constitutional design." *Ibid.*

Third, representative government itself is jeopardized when "deliberation by the political process established by the citizens of the State" is replaced with "judicial decree mandated by the Federal Government and invoked by the private citizen." *Id.,* at 751. Political accountability—"essential to our liberty and republican form of government"— breaks down when "the Federal Government asserts authority over a State's most fundamental political processes." *Ibid.*[7]

Notwithstanding these countervailing structural concerns, both Torres and the Court think that constitutional structure supports finding plan-of-the-Convention waiver because confirming States' sovereign immunity in their own courts would supposedly threaten the Federal Government's "power to wage war successfully" and jeopardize the Nation's safety. *Ante,* at 11 (quoting *Lichter* v. *United States*, 334 U. S. 742, 780 (1948); internal quotation marks

---

[7] These unique structural dangers posed by granting the Federal Government authority to turn the State against itself again show why the Court errs in concluding that precedents concerning plan-of-the-Convention waivers applicable to suits *in federal court* necessarily support waivers of immunity from suit in state court. See *ante,* at 15; see also *supra,* at 10, n. 4.

THOMAS, J., dissenting

omitted); Brief for Petitioner 26. But this argument conflates the preservation of state sovereign immunity with a license to interfere with federal warmaking. As we already cautioned in *Alden*, "The constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the State a concomitant right to disregard the Constitution or valid federal law." 527 U. S., at 754–755.

For example, the Court notes that early Congresses "established military bonuses to reward service, even requiring Virginia to give land to some Revolutionary War officers." *Ante,* at 9 (citing Act of Aug. 10, 1790, ch. 40, 1 Stat. 182).[8] It asks, incredulously, "Could Virginia have refused to go along?" *Ante,* at 9. But that question is a non sequitur. No one disputes "the supremacy of federal power in the area of military affairs." *Perpich* v. *Department of Defense*, 496 U. S. 334, 351 (1990). Instead, all agree that the United States could lawfully sue Virginia in federal court to secure an injunction requiring it to comply with federal law. In fact, USERRA already authorizes suits by the United States to enforce USERRA's requirements. §4323(a)(1).

––––––––––

[8]The Court's characterization of the Act of Aug. 10, 1790, as "requiring Virginia to give land to some Revolutionary War officers" "at the expense of state sovereignty," *ante,* at 9, is deeply misleading. Virginia had ceded the relevant lands to the United States in 1784, but conditionally reserved some of it for the State's Revolutionary War soldiers. See *Wallace* v. *Parker*, 6 Pet. 680, 687 (1832) (Marshall, C. J., for the Court). The 1790 Act opened up the ceded land to those soldiers, and provided that the Secretary of War would send the Virginia Governor the names of those soldiers who were entitled to the land under Virginia law. See §2, 1 Stat. 183. The 1790 Act also provided that the land would be surveyed, that the Executive Branch would draw up land patents for eligible soldiers, and that the Secretary of State would transmit those patents to the Virginia Governor who would, in turn, deliver the patents to the grantees. See §§4–6, *id.*, at 183–184. At most, the 1790 Act required the Virginia Governor only to deliver advantageous federal land patents to the State's own soldiers. How that statute was enacted "at the expense of state sovereignty," *ante,* at 9, is beyond me.

THOMAS, J., dissenting

And even if private suits were necessary to enforce the federal scheme, individuals could still sue in equity to enjoin state officials from violating federal law, see *Ex parte Young*, 209 U. S. 123 (1908), or, if Congress authorizes it, pursue damages actions against such state officials in their individual capacities, see, *e.g.,* Rev. Stat. §1979, 42 U. S. C. §1983. Ultimately, if the Court reaffirmed Texas' sovereign immunity, "[e]stablished rules provide ample means to correct ongoing violations of law and to vindicate the interests which animate the Supremacy Clause." *Alden*, 527 U. S., at 757.

### D

Finally, our precedents do not support finding a surrender of state sovereign immunity here. As explained above, *Alden* is the most on-point precedent—and, in fact, our only recent precedent discussing States' immunity from suit in their own courts. It therefore disposes of this case. Neither *Katz* nor *PennEast* supports a different result.

*Katz* found plan-of-the-Convention waiver based on the "singular nature" of bankruptcy jurisdiction and "the Bankruptcy Clause's unique history." 546 U. S., at 369, n. 9. As the Court later explained, *Katz* "viewed bankruptcy as on a different plane, governed by principles all its own," and nothing in its analysis "invites the kind of general, clause-by-clause reexamination of Article I" that the Court endorses today. *Allen* v. *Cooper*, 589 U. S. ___, ___ (2020) (slip op., at 9) (internal quotation marks omitted).

For its part, *PennEast* emphasized several factors unique to the eminent domain context. First, *PennEast* discussed the Federal Government's long history of exercising the power of eminent domain—including its delegation of that power to private parties to take property within state boundaries. See 594 U. S., at ___ (slip op., at 7). Here, there is a long history showing that the Federal Government exercised its war powers, but there is no comparable history

THOMAS, J., dissenting

of the Federal Government using those powers to impose financial liabilities on States enforceable by private parties. Nor is there any evidence demonstrating that any kind of judicial proceedings—let alone private damages actions—are "inextricably intertwined" with the war powers in the way that judicial condemnation actions are intertwined with eminent domain. See *supra,* at 14–15, n. 6.

Second, *PennEast* emphasized that the Constitution vests the Federal Government "'with full and complete power to execute and carry out its purposes'"—including the power of eminent domain—and that history shows that the Government may exercise that sovereign power through private delegatees. 594 U. S.*,* at ___ (slip op., at 15). Here, there is no argument that employees granted a cause of action under USERRA are "delegatees" of the war powers in any meaningful sense.

Third, *PennEast* reasoned that recognizing New Jersey's immunity claim would require federal delegatees to take state property, thereby forcing States to file inverse condemnation actions for just compensation. See *id*., at ___ (slip op., at 17). The Court did not think that kind of arrangement "would vindicate the principles underlying state sovereign immunity," including the principle of affording States "the respect owed them as joint sovereigns." *Ibid.* (internal quotation marks omitted). Here, by contrast, there is no sense in which confirming Texas' immunity would similarly undermine the principles underlying that immunity.

\*     \*     \*

In the end, the "history, practice, precedent, and the structure of the Constitution" all demonstrate that States did not surrender their sovereign immunity in their own courts when Congress legislates pursuant to one of its war powers. *Alden*, 527 U. S., at 741, 754.

## IV

The Court nevertheless holds that States surrendered their sovereign immunity for any congressional causes of action passed pursuant to Article I's Army and Navy Clauses. *Ante,* at 11–12.[9] To reach that conclusion, the Court adopts a test that even Torres did not press. Relying exclusively on *PennEast*, the Court maintains that plan-of-the-Convention waiver distills to a single question: whether the federal power at issue is "'complete in itself.'" *Ante,* at 6 (quoting *PennEast*, 594 U. S., at ___ (slip op., at 22)). If so, then the States have surrendered their sovereign immunity against any exercises of that power. After framing the inquiry this way, the Court concludes that because Congress' "power to build and maintain the Armed Forces" is "'complete in itself,'" States necessarily relinquished their sovereign immunity against private damages actions authorized by that power. *Ante,* at 6, 11.

In my view, the Court is asking the wrong question. It unjustifiably asserts that the entire plan-of-the-Convention inquiry rests on whether a power is "complete in itself." Further, its "complete in itself" standard misreads *PennEast*, which suggested only that because the federal emi-

_____

[9] Although the Court lists the panoply of congressional "war powers" that Torres invokes, see *ante,* at 7, it appears to limit its holding today only to the Army and Navy Clauses, see *ante,* at 11–12. In addition, although the Court's "complete in itself" inquiry is unsound, see *infra,* at 22–29, its opinion at least suggests that plan-of-the-Convention waiver may be found only if (1) the Constitution includes "many broad, interrelated provisions" delegating the relevant power to the Federal Government, *ante,* at 7; (2) the Constitution expressly "divests the States of like power" in Article I, §10, *ante,* at 7; and (3) the power at issue is "essential to the survival of the Union" and is "itself a foundational purpose" for abandoning the Articles of Confederation and "drafting the Constitution," *ante,* at 13. Until the Court jettisons this erroneous decision from its doctrine, plan-of-the-Convention waiver would appear to exist only under those circumstances.

THOMAS, J., dissenting

nent domain power was "complete in itself" and, by its nature, "inextricably intertwined" with judicial condemnation proceedings, States surrendered any sovereign immunity that would otherwise render the eminent domain power incomplete. *PennEast*, 594 U. S., at ___ (slip op., at 17). By saddling "completeness" with more analytical weight than it can bear, the Court has devised a method that has the certainty and objectivity of a Rorschach test. Beyond its inconsistency with *PennEast*, this contrivance also threatens to rework or erase the Court's prevailing sovereign immunity jurisprudence.

A

The sentence in *PennEast* upon which the Court fabricates its test for plan-of-the-Convention waiver reads as follows: "[T]he federal eminent domain power is 'complete in itself,' and the States consented to the exercise of that power—in its entirety—in the plan of the Convention." 594 U. S., at ___ (slip op., at 22) (quoting *Kohl* v. *United States*, 91 U. S. 367, 374 (1876); citation omitted). The Court today claims that this sentence in *PennEast* reduced our decades-old State sovereign immunity jurisprudence to merely asking whether a federal power is "complete in itself." That cannot be correct.

The Court in *PennEast* borrowed the "complete in itself" idea from *Kohl*, which had approved the Federal Government's condemnation of private land to build a post office in Cincinnati, Ohio. 91 U. S., at 373–374. Although the Federal Government had relied on Ohio's eminent domain power, rather than its own, *Kohl* made clear that the Federal Government's authority to condemn land did not depend upon state law. In doing so, *Kohl* stated that "[i]f the United States have the [eminent domain] power, it must be complete in itself." *Id.,* at 374. "It can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. The consent of a

Thomas, J., dissenting

State can never be a condition precedent to its enjoyment." *Ibid.*

Before *PennEast*, the phrase "complete in itself" never appeared in our modern state sovereign immunity precedents. *PennEast* itself invoked the concept for one purpose: to reject the contention that one could "[s]eparat[e] the eminent domain power from the power to condemn"—*i.e.,* to disaggregate those "inextricably intertwined" powers—when determining whether the history of federal eminent domain supported finding a waiver of state sovereign immunity. 594 U. S., at ___ (slip op., at 17). According to *PennEast*, to deprive the Federal Government of a power to condemn property in judicial proceedings brought by private delegatees would be tantamount to depriving the Government of part of the eminent domain power itself, contrary to *Kohl*'s characterization of that power as "complete in itself." 594 U. S., at ___–___ (slip op., at 17–18).

The Court today errs by attributing to *Kohl* an outsized role in *PennEast*'s sovereign immunity analysis. The Court in *PennEast* never stated that "completeness in itself" represented the governing test for plan-of-the-Convention waiver. Likewise, *PennEast* made no effort to explain how the "complete in itself" inquiry would work beyond the context of eminent domain. And because *PennEast* did not invoke *Kohl* to break new doctrinal ground, the Court made no attempt to reconcile the "complete in itself" inquiry with this Court's longstanding sovereign immunity precedents (*e.g., Alden, Seminole Tribe, Federal Maritime Comm'n, Hans,* etc.). Again, if *PennEast* had made "completeness in itself" the applicable test, surely the Court would have discussed the concept more thoroughly.

The Court compounds its overreading of *PennEast*'s "complete in itself" language by unjustifiably dismissing *PennEast*'s "inextricably intertwined" rationale as a mere "technical aspect" of the decision. *Ante,* at 15. *PennEast* is best read to stand for the proposition that, because every

THOMAS, J., dissenting

federal power must be "complete in itself," the States sur-
rendered their sovereign immunity with respect to any fed-
eral power that is "inextricably intertwined" with judicial
proceedings, like eminent domain; otherwise, sovereign im-
munity would excuse the States from the judicial proceed-
ing and the federal power would be incomplete. *PennEast*,
594 U. S., at \_\_\_–\_\_\_ (slip op., at 16–17) (linking complete-
ness of eminent domain power to condemnation proceed-
ings). Yet, now, the Court abandons the only limiting prin-
ciple in *PennEast*'s test.[10]

   That is mistaken. To begin with, disaggregating the
"complete in itself" standard from *PennEast*'s "inextricably
intertwined" justification renders meaningless the idea of
"completeness" in the context of state sovereign immunity.
Consider the Court's opinion here, which says that any fed-
eral power "complete in itself " must be accompanied with a
surrender of state sovereign immunity. The Court does not
define what it means for a federal power to be "complete in
itself," except that "'the States consented to the exercise of
that power—in its entirety—in the plan of the Conven-
tion.'" *Ante,* at 6 (quoting *PennEast*, 594 U. S., at \_\_\_ (slip
op., at 22)). But that self-referential definition begs the
question. If the Court tied the "completeness" of a federal
power to an inherent connection with judicial proceedings,
it could give the term independent meaning and make
sense of *PennEast*'s actual analysis.

   Worse still, today's decision removes the one important
guardrail on the "completeness" inquiry that *PennEast* de-
scribed. Absent that limit, the Court's indefinite test will
provide future courts cover to further erode the States' sov-
ereign immunity.

―――――――――
   [10] My "quarrel" therefore does not "li[e] with *PennEast*," *ante,* at 13, but
with the Court's decision today to convert *PennEast*'s "complete in itself "
language into an all-encompassing sovereign-immunity test that is di-
vorced from *PennEast*'s "inextricably intertwined" principle.

Thomas, J., dissenting

## B

To the extent that the Court's new "complete in itself" standard has any definable contours, it is inconsistent with our modern sovereign immunity doctrine and, in particular, *Seminole Tribe.*

As I noted above, the Court does not define what it means for a federal power to be "complete in itself" under *PennEast* and *Kohl.* All we are told is that eminent domain and the powers to raise and support armies and navies are powers "complete" in themselves. See *ante,* at 6, 11.

The Court's "completeness" standard is indeterminate in large part because the Court fails to recognize that the concept of a federal power being "complete in itself" long predates *Kohl* and means something quite different from what the Court says it does. In fact, the phrase's provenance in our jurisprudence dates back to no less seminal a decision than Chief Justice Marshall's opinion in *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824). There, the Court stated that Congress' power "[t]o regulate Commerce with foreign Nations, and among the several States," U. S. Const., Art. I, §8, cl. 3, "like all others vested in Congress, *is complete in itself,* may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution," 9 Wheat., at 196 (emphasis added).

*Gibbons*' discussion is revealing. First, unlike the Court's decision today, which attempts to cabin congressional powers that are "complete in themselves" to only a few, *Gibbons* is explicit that it considered *every* power vested in Congress to be "complete in itself." *Ibid.* That understanding would explain why *Kohl* said that "[i]f the United States have the power, it *must* be complete in itself." 91 U. S., at 374 (emphasis added). Second, unlike the Court today, *Gibbons* defines what it means for a power to be complete in itself— the power "may be exercised to its utmost extent" with "no limitations" beyond those in Constitution itself. 9 Wheat., at 196. In other words, the power is plenary as to those

THOMAS, J., dissenting

subjects to which it applies.  See *id.,* at 197.

*Gibbons*' understanding of a congressional power being "complete in itself" was repeated by this Court time and time again for nearly two centuries.  Almost always, the Court used the term to refer to Congress' authority to regulate interstate and foreign commerce.[11]  And, over time, the Court confirmed that because Congress' power over interstate commerce "is plenary and complete in itself . . . [i]t follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress."  *United States* v. *Wrightwood Dairy Co.,* 315 U. S. 110, 119 (1942); see also *Wickard* v. *Filburn*, 317 U. S. 111, 124 (1942).  This language echoes *Kohl*'s holding that the federal eminent domain power "can neither be enlarged nor diminished by a State."  91 U. S., at 374.

Ignoring this long history about the very "completeness" standard that it purports to apply, the Court grasps for some basis to explain how its decision is consistent with this Court's understanding of Congress' commerce power in *Seminole Tribe.*  It asserts that Congress' power under the Army and Navy Clauses is somehow "complete in itself" while its power under the Commerce Clause is less than "complete" because "federal regulation of commerce (at issue in *Seminole Tribe*) involves goods that, before they

─────────

[11] See, *e.g., Brown* v. *Maryland*, 12 Wheat. 419, 446 (1827) (Marshall, C. J., for the Court) (a power "complete in itself" is "coextensive with the subject on which it acts"); *Kidd* v. *Pearson*, 128 U. S. 1, 17 (1888); *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211, 228 (1899); *Lottery Case*, 188 U. S. 321, 347 (1903); *Second Employers' Liability Cases,* 223 U. S. 1, 47 (1912); *Hoke* v. *United States*, 227 U. S. 308, 323 (1913); *United States* v. *Carolene Products Co.*, 304 U. S. 144, 147 (1938); *United States* v. *Darby*, 312 U. S. 100, 114 (1941); *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 254–255 (1964); *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 276 (1981); *United States* v. *Lopez*, 514 U. S. 549, 553 (1995); see also *South Carolina* v. *Katzenbach*, 383 U. S. 301, 327 (1966) (characterizing Congress' authority under §2 of the Fifteenth Amendment as "'complete in itself'").

THOMAS, J., dissenting

travel between States or outside a tribe, are subject to regulation by a sovereign other than the Federal Government (a State or tribe)."  *Ante,* at 13.

But the Court's proposed distinction makes no sense.  For one, it conflicts with the Court's longstanding characterization of Congress' commerce power as plenary.  See, *e.g., Armour & Co.* v. *Virginia,* 246 U. S. 1, 6 (1918).  As long as the goods mentioned by the Court are in fact part of "interstate commerce," then Congress has authority to regulate their travel *at all times.*  For another, it does nothing to distinguish Congress' commerce power from its power to raise and maintain a military.  Following the Court's logic, one could just as easily say that Congress' power under the Army and Navy Clauses is "less than complete" because "federal regulation of soldiers involves men and women who, before they join the military, are subject to regulation by a sovereign *other* than the Federal Government."  Despite the Court's efforts, its "completeness" analysis simply fails to distinguish the Army and Navy Clauses from other Article I powers delegated to Congress in the plan of the Convention.[12]

─────────

[12]The Court also makes what appears to be an alternative argument.  Invoking Hamilton's discussion of state sovereignty in The Federalist, the Court says that States surrendered their sovereign immunity where the Constitution "'granted an authority to the Union, to which a similar authority in the States would be absolutely and totally *contradictory* and *repugnant.*'"  *Ante,* at 4–5 (quoting The Federalist No. 32, p. 200 (J. Cooke ed. 1961)).  The Court then remarks, seemingly in dicta, that "an assertion of state sovereignty to frustrate federal prerogatives to raise and maintain military forces would be strongly '*contradictory* and *repugnant*' to the constitutional order."  *Ante,* at 13 (quoting The Federalist No. 32, at 200).  But that reasoning is hardly different from the argument made by Justice Souter when he dissented in *Seminole Tribe* with respect to the Indian Commerce Clause and Congress' exclusive authority in that area.  See 517 U. S., at 148 ("[S]ince the States have no sovereignty in the regulation of commerce with the tribes, on Hamilton's view there is no source of sovereign immunity to assert in a suit based on congressional regulation of that commerce").  Similarly, the Court has often held

THOMAS, J., dissenting

Most troubling, however, is the clear parallel between the Court's analysis today and the discredited approach to sovereign immunity that we rejected in *Seminole Tribe*. For example, in *Parden* v. *Terminal R. Co. of Ala. Docks Dept.*, 377 U. S. 184 (1964), the Court relied on *Gibbons*' "complete in itself" language to hold that "the States surrendered a portion of their sovereignty when they granted Congress the power to regulate commerce." *Id.,* at 191; see also *id.,* at 192. *Parden* reasoned, not unlike the Court today, that "[t]he sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution," and that granting Congress "plenary power to regulate commerce" amounts to a surrender of immunity. *Id.,* at 191 (internal quotation marks omitted).

Similarly, in *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989), the plurality emphasized how "[i]t would be difficult to overstate the breadth and depth of the commerce power," *id.,* at 20, and how the "[t]he Commerce Clause with one hand gives power to Congress while, with the other, it takes power away from the States," *id.,* at 16. In light of this dual grant of federal authority and divestment of state authority, the plurality thought Congress' commerce power "would be *incomplete* without the authority to render States liable in damages." *Id.,* at 19 (emphasis added). To complete that congressional power, the plurality reasoned that "to the extent that the States gave Congress the authority to regulate commerce, they also relinquished their immunity where Congress found it necessary, in exercising this authority, to

———————

that Congress' power to regulate interstate and foreign commerce is also "exclusive." *E.g., Cloverleaf Butter Co.* v. *Patterson*, 315 U. S. 148, 154–155 (1942); *Board of Trustees of Univ. of Ill.* v. *United States*, 289 U. S. 48, 56–57 (1933). So again, the Court cannot explain how its interpretation of Hamilton or its understanding of the war powers coheres with *Seminole Tribe* and does not sweep in other Article I powers like the Commerce Clause.

THOMAS, J., dissenting

render them liable." *Id.,* at 19–20.

We repudiated *Parden* and overruled *Union Gas* in *Seminole Tribe.* See 517 U. S., at 66; see also *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd.*, <u>527 U. S. 666, 683</u> (1999) (*Seminole Tribe* "expressly repudiate[d]" *Parden*'s theory of plan-of-the-Convention waiver).  Therefore, if *Seminole Tribe* was right, then the Court's decision today is wrong.  Hopefully, the Court will someday purge the newly fashioned "completeness" standard from our jurisprudence.

\*    \*    \*

"Congress has ample means to ensure compliance with valid federal laws, but it must respect the sovereignty of the States."  *Alden*, 527 U. S., at 758.  If the Court's reading of USERRA is correct—and I am unsure it is, see *supra,* at 5–7—then Congress has not "accord[ed] States the esteem due to them as joint participants in a federal system."  527 U. S., at 758.  To nonetheless deem USERRA constitutional, the Court brushes aside a 23-year-old, pathbreaking precedent, while elevating a single phrase, made in passing in a one-year-old, highly circumscribed precedent.  It then uses that phrase to fashion a test for plan-of-the-Convention waiver that mimics earlier attempts by this Court to deny States the dignity owed to them in our system of dual federalism.

Our sovereign States deserved better.  I respectfully dissent.